GRAND VALLEY LAKES PROPERTY OWNERS ASSOCIATION, INC.,
Plaintiff/Appellee,

v.

Charles M. CARY, as Substitute, Trustee of an Aforesaid Deed of Trust and Burton Shearin, Beneficiary of Said Deed of Trust, Defendant/Appellant,

v.

Mary Oneida BALDREE, et al.,
Third–Party Defendants,

v.

GRAND VALLEY LAKES PROPERTY OWNERS ASSOCIATION, INC.,
Plaintiff/Appellee,

v.

Burton SHEARIN, Defendant/Appellant.

No. 02A01–9301–CH–00015.

Court of Appeals of Tennessee,
Western Section.

Aug. 12, 1994.

Application for Permission to Appeal Denied by Supreme Court
Jan. 3, 1995.

Charles M. Cary, Bolivar, for Burton Shearin.

James T. Sanderson & Associates, Bolivar, for appellee.

TOMLIN, Presiding Judge (Western Section).

Grand Valley Lakes Property Owners Association, Incorporated ("Grand Valley" or

"plaintiff") filed suit in the Chancery Court of Hardeman County against Burton Shearin ("Shearin" or "defendant") and the substitute trustee under a deed of trust, seeking to restrain Shearin from foreclosing on certain property, and to have a deed of trust declared a nullity. In an amendment to the complaint, Grand Valley also sought to collect from Shearin, as a property owner, certain delinquent dues. By a counter-claim, Shearin sought damages from Grand Valley for its failure to provide and maintain roads to his various properties in the development. Following a bench trial, the chancellor found and ruled as follows: (1) notwithstanding that its charter had been revoked, plaintiff still had the legal capacity as an "Association" to sue Shearin; (2) the filing of bankruptcy prior to the foreclosure by John Browning, a personal co-maker of the Grand Valley note, automatically stayed foreclosure proceedings; (3) Shearin failed to give proper notice pursuant to his agreement with Grand Valley regarding the foreclosure of land north of Lake Hardeman Road, thus voiding the foreclosure; (4) the partial release executed earlier by Shearin included Grand Valley Lake; (5) Grand Valley had failed to follow the restrictive covenant provisions regarding an increase in association dues and was therefore indebted to Shearin in the amount of $864, representing excess dues paid by him; and (6) Shearin failed to offer sufficient proof to establish a diminishment in value of his real property.

On appeal, defendant has raised the following issues: whether the chancery court erred in finding (1) that Grand Valley Lake was included in the property released by Shearin's partial release; (2) that Shearin failed to give proper notice of the foreclosure sale pursuant to a written agreement between him and Grand Valley; (3) that the bankruptcy of John Browning stayed the foreclosure proceedings; (4) that plaintiff had the legal capacity to bring this suit; and (5) that Shearin failed to establish by sufficient proof diminishment in value to his lots thereby entitling him to damages. In addition, Grand Valley presents the following issues on appeal: whether the chancery court erred in finding (1) that it had failed to comply with its rules and regulations in increasing dues of members of the property owner's association; (2) that it was indebted to Shearin in the amount of $864; and (3) that it was not entitled to collect interest on the allegedly delinquent dues. For the reasons stated hereafter, we reverse in part and affirm in part.

Grand Valley Lakes is a residential development built around a golf course and several lakes in Hardeman County. The principal developer of this project was John Browning, who served as the original President of Grand Valley Lakes, Inc., the developing corporation. Browning and Grand Valley Lakes Inc.[1] entered into a contract with Shearin to build the first nine holes of an eighteen hole golf course known as Grand Valley Lakes Golf Course. As payment for this project, Shearin was given a promissory note signed by both the corporation and Browning individually, secured by a deed of trust on most of the property in the development. This deed of trust constituted a first lien on some of the property and a second lien on another portion of the property. The deed of trust given to Shearin provided, among other things, that if Grand Valley failed to timely pay any property taxes, then Shearin could, as an interested party, pay the taxes himself. In that event, any taxes so paid would be secured by the deed of trust. Over the years that followed the completion of the golf course, Shearin paid some $65,858.76 in back taxes to prevent the property being sold by Hardeman County at a tax sale. Shortly after the deed of trust was recorded in 1978, Grand Valley Lakes Inc., the developer, conveyed most, if not all, of the property that was encumbered by the deed of trust to plaintiff, Grand Valley Lakes Property Owners Association, Inc., the formal name for the homeowner's association.

The above-mentioned conveyance spawned a lawsuit, styled *Weir et al. v. John Browning and Grand Valley Lakes, et al.* That litigation centered around the transfer of

---

1. Not to be confused with the plaintiff, whose formal name is Grand Valley Lakes Property Owners Association, Incorporated.

money by Grand Valley Lakes Inc., the developer, to plaintiff. These were funds that had been collected by the developer from the property owners as dues. Also in contention was the transfer of improvements and certain real estate of Grand Valley Lakes to plaintiff. This suit was ultimately settled. As part of the settlement, Shearin was to, and did, receive $77,000. In exchange for this payment, Shearin executed a partial release by which he released from his deed of trust some of the real estate constituting the residential development. This brings us to our first issue.

## I. Defendant's Partial Release and its Scope

Grand Valley's attorney, James Blackburn, prepared the partial release for Shearin's execution. The relevant portions of this release read as follows:

### PARTIAL RELEASE

Know all men by these presents that for and in consideration of the part payment of the indebtedness described in and secured by that certain Deed of Trust dated July 23, 1976 executed by Grand Valley Lakes, Inc. et al. and Malcom Vincent as Trustee(s), .. [Burton Shearin] has bargained and sold and by these presents does bargain, sell, convey, remise, release and quitclaim unto the said Grand Valley Lakes, Inc. et al, the following described property located in Hardeman County, Tennessee, to-wit:

Parcel (I) The improvements, buildings, roads, and property located north of Lake Hardeman Road and east of a line from Lake Hardeman Road *parallel* with Grand Valley Drive West extending N16° 15' 55" East to the north boundary of the Grand Valley Lakes subdivision, to include Golf Course, Site 1, 2 and 3, Tract One containing 9.4854 acres as described in this Trust Deed....

Note: See attached Agreement. Exhibit B.

To have and to hold the aforesaid real property unto the said Grand Valley Lakes, Inc. and to its successors, heirs and assigns in fee simple forever, free and discharge from the lien of said deed of trust and the indebtedness secured thereby....

(Emphasis added).

From a legal standpoint, the issue as to the partial release is whether it is ambiguous and therefore unenforceable. As a practical matter, the issue is whether the 225 acre Grand Valley Lake was released from Shearin's deed of trust by the partial release, or whether it remained as part of the security Shearin still had for the balance due and owing on his note and for the delinquent taxes which he had paid on behalf of Grand Valley. Simply put, the difficulty lies in where the pivotal line located "parallel" with Grand Valley Drive West is, and finding the beginning point of this line.

The chancellor made the following finding of fact as to this issue:

4. The term "parallel" as used in the "call" of the Partial Release, dated January 19, 1979, is determined to be a line running just along side of the road, as close to the road as possible, such that it included "the lake" known as Grand Valley Lake, and that lake was released in the Partial Release.

Following a post-trial motion for clarification of judgment, the chancellor made a further finding stating that "[a]s to paragraph four (4) of the Final Order the Court finds based upon the proof in the record that the line is to run parallel EAST of Grand Valley Drive West."

All findings of fact in non-jury cases appealed to this court come to us with a presumption of correctness. On appeal, our scope of review is *de novo* upon the record. Absent an error of law, unless we find that the evidence preponderates against those findings, we must affirm. Rule 13(d) T.R.A.P. Implicit in the chancellor's findings is the conclusion that the description of the property released by the partial release is not ambiguous.

James Blackburn, Grand Valley's attorney, prepared the legal description contained in the partial release without the benefit of a survey or a surveyor. Blackburn testified

that while he had substantial experience as a real estate attorney, he rarely prepared a partial release such as the one in question. According to his testimony, Grand Valley Lakes Drive West did not run the entire length of the property, but rather it was a place for the location of the line for the property to be released east of the line that runs parallel from Lake Hardeman Road to the north end of the property. He testified that he used the word "parallel" in the partial release rather than the word "adjacent" and that the distance between the two parallel lines was "right adjoining."

Blackburn also prepared the quitclaim deed by which the development company conveyed lands to plaintiff. That instrument sought to convey to plaintiff "all of the amenities, roads, greens space, common ground, lakes, and improvements along with all of the personal property and fixtures contained therein of the Grand Valley Lakes Subdivision. . . ." (emphasis added.) That deed was prepared and delivered in 1978. It should be noted that the partial release prepared by Blackburn in January 1979 in no way mentioned a "lake." In his testimony Blackburn admitted that while he did not specifically include the lake in the partial release, in drafting this document he did specify certain specific things to be included such as golf course sites # 1, # 2 and # 3 and Tract 1 that contained 9.4854 acres.

Blackburn further testified that it was understood by Shearin that the lake was to be included in the release. However, Shearin testified that as the lake was not mentioned in the partial release, as already noted, and that it was to remain under the deed of trust. He stated that Blackburn demanded that he release the lake and that he refused, and that he did not release any part of the lake. Shearin testified further that Blackburn told him that if he did not release the dam from the trust deed that he was never going to get his $77,000. Shearin testified that ultimately, Blackburn requested that he release the picnic area, golf course sites # 1, # 2 and # 3 and the 9.48 acres where the pool and recreational center, tennis court, restaurant and storage building were located. He further testified that he and Blackburn never discussed the call for the parallel line, but only the property that was to be released.

Walter Anderson, a professional engineer, was a witness for the plaintiff. He worked on the Grand Valley property in 1972 and was familiar with the property. He testified that plaintiff had not requested that he survey what was included in Parcel 1 of the partial release, and that he could not plot the partial release as drawn because it had no beginning point and did not specify the distance between the parallel lines.

James Hugh Ragon, a professional engineer who testified on behalf of the defendant, stated that he was the principal engineer in charge of the development of Grand Valley Lakes and that Walter Anderson worked under contract with him at that time. Mr. Ragon testified that he had reviewed the deed of trust as well as the partial release and that the call "north 16 degrees, 15 minutes, 55 seconds east" was indefinite because it had no beginning, or any point from which the line was to go through, and that there were an indefinite number of lines that have that call and meet the criteria set forth in the partial release. He further stated that the line could lie anywhere east of Grand Valley Lakes Drive West. He further testified that he could not, from the partial release, determine what property was released.

Kenneth Max Billingsley, a registered land surveyor, also testified for defendant. Billingsley testified that without the help of someone familiar with the description to help establish it, that a surveyor could not locate the point on the ground specified by the call parallel to Grand Valley Drive West. He stated that without a distance, the call could not be located. Billingsley summed up the description in the partial release in this manner: "I've seen some pretty bad descriptions in my time, and I've seen lots of descriptions in deeds that can't be precisely located or plotted, and this is one of them."

■ It is well settled that parol evidence may not be offered to vary the terms of a written instrument which is clear and unambiguous on its face. *Moon v. Webb,* 584 S.W.2d 803, 805 (Tenn.App.1979). However, when an ambiguity is present, "parol evidence is admissible to 'apply' the description

contained in a written instrument, but such evidence is inadmissible to 'supply' a description omitted therefrom." *Parsons v. Hall,* 184 Tenn. 363, 199 S.W.2d 99, 101 (1947) (citing *Dougherty v. Chesnutt,* 86 Tenn. 1, 5 S.W. 444 (1887).

 A release is a contract, and rules of construction for the interpreting of a contract are used in construing a release. *Jackson v. Miller,* 776 S.W.2d 115, 117 (Tenn.App.1989). It has long been the law that ambiguities in contracts, agreements, etc., are to be construed against the party drafting the instrument. *Id.* at 117. It is uncontradicted that plaintiff's attorney prepared the partial release. Therefore, under our case law, Grand Valley must suffer the consequences of the unartful and incomplete description found in the release. However, of greater importance in our opinion, the evidence in this case preponderates against the finding of the chancellor as to the location of the unlocated line, and as to the conclusion that the lake known as Grand Valley Lake is included in the partial release. We therefore reverse the chancellor as to this issue.

## II. The Adequacy of the Notice of Foreclosure

The Partial Release discussed above contained a notation at the bottom, "see Exhibit B." Exhibit B is an agreement executed at the same time as the partial release by Grand Valley and defendant and deals, in part, with the procedure agreed upon by the parties in the event of a foreclosure of any of the property covered by Shearin's Deed of Trust. Exhibit B states in relevant part as follows:

WHEREAS, the note holder, Burton Shearin, has agreed to conditions giving certain rights to the First Party (Grand Valley) in the event the Debtor (Grand Valley) defaults in payment of said note and its provisions for payment.

(2) The First Party may purchas (sic) the note now owned by Burton Shearin or his successors for the principal balance plus interest at any time prior to the foreclosure sale.

(3) THat (sic) in the event of default, Shearin or his successors in interest agree

to foreclose on the property securing said loan south of Lake Hardeman Road being the Scruggs Property referred to in the Trust Deed first and only in the event of a deficiency balance, on the property under the trust deed lying north of Lake Hardeman Road. Once a deficiency is determined, the note holder agrees to notify the First Party who may then purchase said note for the balance then due by the terms of the note.

The foreclosure sale was held on May 15, 1987. Prior to that time, the Trustee's notice of sale was published in a newspaper of general circulation in the area for three consecutive weeks. In addition, the Trustee mailed a certified copy of the Trustee's Notice of Sale to plaintiff's attorney. Shearin also personally sent a letter dated, March 12, 1987 by certified mail to Grand Valley and by regular mail to each member of its Board of Directors which read as follows:

In accordance with an agreement reached several years ago I am obligated to do two things:

1. Offer the Property Owners Association my note and trust deed for the amount due. This was $87,828.90 on March 1, 1987 and interest is accruing at $42.871 per day. This constitutes the offer and you have 10 days to pay me or foreclosure will proceed.

2. Sell first that portion south of Lake Hardeman Road and if it brings enough to clear the debt, not sell the portion north of said road. It should be obvious that all the property together will not bring enough to satisfy the debt, so this portion will be sure to sell.

I intend to fully honor the commitments outlined above.

On the day of the sale, the Substitute Trustee first offered for sale the property located south of Lake Hardeman Road. No bids were received at that time. After then announcing the amount of the deficiency, the Substitute Trustee then offered for sale the properties located both north and south of Lake Hardeman Road, together. Both properties were sold at that time.

As to this issue, the chancellor found that pursuant to the agreement between Shearin and plaintiff, proper notice was not given. The chancellor found that because a "reasonable" time was contemplated by the parties and was fundamental to the agreement, that selling the property north of Lake Hardeman Road immediately after no bids were received on the south property did not constitute proper notice in accord with the parties' agreement.

■ The evidence does not preponderate against this finding of the chancellor. While Shearin gave ample notice to the public as well as to Grand Valley of the impending foreclosure sale, the actions of the Trustee in proceeding with the sale of the land north of Lake Hardeman Road immediately on the heels of the failure to sell the land south of Lake Hardeman Road was not in compliance with the spirit and intent of the agreement.

We now consider the effects of the filing of the bankruptcy petition by John Browning. On the day of the foreclosure sale, counsel for Grand Valley appeared at the sale and publicly announced that John Browning had filed a petition in bankruptcy the previous day, and any sale would therefore be of no effect. After some deliberation, Shearin and his attorney decided to proceed with the sale. Although it does not appear in the record what type of bankruptcy Mr. Browning filed, he stated that the purpose of his bankruptcy filing was to stop the foreclosure sale. The filing of bankruptcy triggered the automatic stay protection of 11 U.S.C. § 362.

■ The automatic stay provisions of 11 U.S.C. § 362(a) apply only to state court proceedings seeking to obtain property that is part of the debtor's estate in bankruptcy. *Bill Walker & Assocs., Inc. v. Parrish,* 770 S.W.2d 764, 768 (Tenn.App.1989). The issue, therefore, is whether Browning's bankruptcy filing the day before the foreclosure sale affected property which would be part of Browning's estate affected by the automatic stay.

The original note given to Shearin as payment for his work on the Grand Valley Lakes Golf Course in the amount of $134,749.71 was executed by John Browning as President of Grand Valley Lakes, Inc. as well as by John Browning, and his wife, individually. Shortly after Shearin was paid $77,000.00 for the now famous "Partial Release," John Browning and his wife, individually, and in his corporate capacity as an officer of Grand Valley, executed another note payable to Shearin for the remaining balance of the original note in the amount of $71,366.01, secured by Shearin's deed of trust on all property not included in the Partial Release. Later, Grand Valley Lakes, Inc. and John Browning executed an "Extension Agreement" by which the life of the Promissory Notes in question owed to Burton Shearin were extended. This extension agreement contained a reaffirmation of these parties' obligations on these notes.

■ It is clear from this record that John Browning is personally liable upon the notes payable to Shearin which were secured by the deed of trust sought to be foreclosed on by Shearin. The automatic stay provisions imposed by 11 U.S.C. § 362(d) would have included the foreclosure proceedings because of Browning's personal liability on the second promissory note. In light of all the circumstances in this case, including the voluntary dismissal of the bankruptcy petition some three days later by Browning, we are of the opinion that the chancellor did not err in his findings. Moreover, Shearin's failure to give proper notice in accordance with the parties' agreement nullified the foreclosure proceedings, thereby making the effect of Browning's bankruptcy filing a moot issue.

### III. Plaintiff's Legal Capacity to Sue

■ Grand Valley's corporate charter was revoked by the State of Tennessee on March 20, 1985 for its for failure to file annual reports with the Department of Revenue as required by law. This suit was filed by plaintiff on May 14, 1987. Plaintiff's corporate charter was not reinstated until some thirteen days later. Defendant contended that because plaintiff's suit was filed during period its charter had been revoked, plaintiff was without legal capacity to bring this suit. On the other hand, plaintiff contends that the revocation of its corporate charter is irrele-

vant because it was suing as a property owner's *association*, not a corporate entity.

Although Grand Valley admits that no corporate minutes existed actually authorizing the filing of this suit, evidence was introduced that its Board of Directors had unanimously voted to file this suit against Shearin. Grand Valley also contends that their bylaws permitted its officials to initiate a suit, and that no annual meeting was required to bring litigation such as this.

We agree with the chancellor that Grand Valley possessed the legal capacity to bring this suit. In *Loveday v. Cate*, 854 S.W.2d 877, 880 (Tenn.App.1992) this court stated:

> It is also important to note that the sole purpose of . . . the statute authorizing revocation and reinstatement of a corporate charter is to raise revenue for the state. *Kerney v. Cobb*, 658 S.W.2d 128, 131 (Tenn. App.1983). The statute does not stand for the proposition that once a corporation's charter is revoked that corporation no longer exists and therefore any acts by the "corporation" are invalid. This is evident by the fact that reinstatement of the charter validates the corporation's existence and privileges from the date of revocation. *Id.*

*Loveday*, 854 S.W.2d at 880. Accordingly, we find this issue to be without merit.

## IV. Claim for Delinquent Dues

■ Grand Valley sought to recover from Shearin delinquent property owner association dues alleged to be owed by him. Shearin contended that the property owner association dues had not been lawfully increased in accordance with the Restrictive Covenants as filed in the Register's Office in Hardeman County. Grand Valley asserted that the By-laws, and not the Restrictive Covenants, governed the increase of property owners' dues, and that all increases had been made in accordance with its By-laws. The chancellor found that the Restrictive Covenants governed, and that a majority of the members of the subdivision had never voted to increase the dues. The chancellor limited plaintiff's claim against Shearin to $48.00 per lot per year, and awarded defendant a judgment for

excess payment of dues against plaintiff in the amount of $864.00.

The Restrictive Covenants establish the dues of property owners at $48.00 per year per lot. The same covenants also provided that this amount could not be changed until after January 1, 1982. No attempt was ever made to change the dues according to the procedure set forth in the Restrictive Covenants, which require two-thirds of all lot owners agreeing in writing to put into effect an increase, or a meeting specially called for the purpose of changing the dues in which two-thirds of all members of the subdivision approved the increase. As to this issue, we find no error by the chancellor.

Because dues had never been properly increased, the chancellor awarded Shearin a judgment in the amount of $864.00 as a refund for his overpayment of dues in 1984. Plaintiff contends that the evidence preponderates against this finding. In addition, Grand Valley seeks a judgment against Shearin for delinquent dues resulting from his failure to pay them since 1985.

Plaintiff offered some documentary proof that Shearin failed to pay dues on some of his 65 lots since 1985. The amount allegedly owed, however, was based upon a set interest rate, and upon the dues that had been improperly increased. Shearin testified that while he might owe some outstanding deficient dues, he only owed on those lots numbering among the 65 that were serviced by a blacktop road, and were served by water and electricity.

■ However, Shearin asserts that the burden of proof was on the plaintiff in the trial court to prove by a preponderance of the evidence the amount of dues owed by Shearin in accordance with the standards of the property owner's association. We are of the opinion that plaintiff failed to meet that burden, and resolve this issue in favor of Shearin.

Grand Valley also sought interest on the delinquent dues allegedly owed by Shearin since 1985. Because Grand Valley has not carried its burden of proof to establish the amount, if any, of delinquent dues owed by Shearin, the same is true as to any interest allegedly owed. Accordingly, this issue is resolved in favor of defendant.

### V. Alleged Damages for Lack of Access

In his counter-complaint, Shearin alleged that he had suffered damages because plaintiff had failed to provide good road access to his lots. Shearin asserted that in failing to provide proper access, plaintiff had breached its contract with him, thus relieving any obligation for him to pay property owner's dues. We have previously disposed of the property owner's dues question, and will address only the matter of alleged damages because of lack of access.

The chancellor found that defendant had failed to demonstrate a lack of access to his lots so as to diminish their value to any significant extent, and awarded no damages. We have reviewed this record, and we are of the opinion that the evidence does not preponderate against this finding of the chancellor.

For the reasons hereinabove stated, we reverse the chancellor as to his finding that the partial release legal description was not ambiguous and that Grand Valley Lake was included in the released property. As to all other aspects of the chancellor's decree, we affirm. Costs in this cause on appeal are taxed one-half to Grand Valley and one-half Shearin, for which execution may issue if necessary.

HIGHERS and FARMER, JJ., concur.